IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN ANDREAS YOUTH SOCCER
ORGANIZATION, a California nonprofit
corporation; L.F., a minor, by his guardian ad
litem, Nicole Fuentes; K.I., a minor, by her
guardian ad litem, Christopher Inglis; K.J., a
minor, by her guardian ad litem, Kurt Jorgensen;
K.K., a minor, by his guardian ad litem, Shahin
Karamdashti; L.L., a minor, by his guardian ad
litem, Luke Lonergan; C.L., a minor, by her
guardian ad litem, Dennis Louie; S.S., a minor,
by her guardian ad litem, Basil Said; D.S., a
minor, by his guardian ad litem, Helmut
Sollfrank; S.V., a minor, by her guardian ad
litem, Cisco Villalta,

                    Plaintiffs,

v.

CITY OF SAN CARLOS, a body politic, MARK
WEISS, in his capacity as City Manager of the
City of San Carlos; and DOES 1-20, inclusive,

                    Defendants.
_____/

No. C 06-03155 SBA

**ORDER**

[Docket No. 24]

This matter comes before the Court on defendants City of San Carlos and Mark Weiss's[1]

Motion for Summary Judgment, or in the Alternative Partial Summary Judgment [Docket No. 24].

Having read and considered the arguments presented by the parties in the papers submitted to the

Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby

GRANTS defendants' Motion for Summary Judgment.

---

[1]Because the Defendant Mark Weiss is being sued in his official capacity as the City Manager of San Carlos, the plaintiffs are in effect only suing the City. "The real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Accordingly, in the following analysis the City and Weiss are treated as a single defendant.

United States District Court
For the Northern District of California

**BACKGROUND**

Plaintiffs spin a yarn alleging a vast conspiracy involving soccer-moms, the City Planning Board, the City Attorney, the City Council, and two non-profit soccer leagues, all of whom purportedly acted in concert to deprive plaintiff San Andreas Youth Soccer Organization ("SAYSO") of the use of playing fields in the City of San Carlos and to keep SAYSO from advertising its soccer tryouts in San Carlos.[2] The primary theme of plaintiffs' lawsuit is that City officials "engaged in a selective, arbitrary and shifting interpretation of its field-use policy, a policy which though neutral on its face, is actually being used (and retroactively adjusted) by Defendants to provide the cover for an effort to target SAYSO." Opp. at 15:18-21.

**1.     The Field Use Permits**

SAYSO is a youth soccer organization that operates primarily on the San Francisco Peninsula. Compl. at 2:2-7. The individual plaintiffs are members of SAYSO. *Id.* at 2:19-4:25. SAYSO was first started in 1994. *See* Deposition of Michael Lindeburg, President of SAYSO, attached as Exh. A to Decl. of Benjamin P. Fay at 12:2-6. It was initially started to enable a team of youth players to stay together until they went to college. *Id.* at 12:12-13:17. From 1994 to 1999, SAYSO was only a single team. *Id.* at 25:23-26:8. In 1999, the team disbanded, and in 2000 and 2001 SAYSO had no players and no teams. *Id.* at 26:6-27:2. SAYSO restarted in the spring of 2002 with approximately 50 players and two teams. *Id.* at 26:23-27:6.

SAYSO offers its players competitive soccer; it is a selective organization and players must try out in order to join. *Id.* at 37:20-38:11. The primary soccer club providing competitive soccer in San Carlos has been San Carlos United. *Id.* at 37:9-22. The San Carlos American Youth Soccer

---

[2] It should be noted that SAYSO's failure to obtain permits to play on San Carlos fields does not mean SAYSO cannot play anywhere — as it alleges in its Complaint, SAYSO has already been granted field use privileges in the neighboring cities of San Mateo, Redwood City, Foster City, and Belmont. *See* Compl. at ¶ 18 ("Because SAYSO serves children in many cities, multiple field use applications to cities of Plaintiff's participants typically produce a satisfactory aggregate result (i.e., sufficient permitted field usage in those cities) for SAYSO and its participant families. For instance, within the months prior to filing of this Complaint, the cities of San Mateo, Redwood City, Foster City, and Belmont have all allotted field usage to SAYSO for 2006. Defendant City, however, refuses to do so.")

Association ("San Carlos AYSO") provides recreational soccer in San Carlos, which is open to everyone. *Id.* at 36:9-37:3.

Unlike San Carlos United and San Carlos AYSO, SAYSO draws its players from all over the Peninsula and from the East Bay. *Id.* at 31:24-32:5. SAYSO advertizes that this is a major difference between itself and city-based soccer clubs. For example, on its website, SAYSO states:

> CYSA [California Youth Soccer Association]clubs are generally limited in their targeted audiences by city boundaries. . . SAYSO, without geographical limitations . . . is able to combine players from neighboring cities. . . . restrictions, requirements, and limitations that city-based soccer clubs place on players for various reasons do not apply to SAYSO.

*See* SAYSO Frequently Asked Questions, available at http://www.sayso.org/faqs.html (last visited May 2, 2007). According to the Complaint, out of 500 participants in SAYSO, only 70, or 14%, are residents of San Carlos. Compl. at 6:4-8.

Playing fields are in high demand in the City of San Carlos. *See* Decl. of Jennifer Moore at ¶ 3. To cope with the high demand for its fields, since at least September 5, 2001, use of the City's parks and playing fields has been governed by a City Field Use Policy ("the Policy"), which provides for use of City fields only by "organizations and teams"with a majority of San Carlos residents in their membership. *Id.* at Exh. A. Specifically, the Field Use Policy states: "Because the demand for fields is so high, only organizations and teams with a majority of San Carlos residents will be considered for field permits." *Id.* The Field Use Policy also provides that "[f]irst priority shall be given to organizations with 90% or greater overall residency and not less than 80% residency per team." *Id.*

In order to apply the residency requirements of the Policy, the City requires that applicants for field use permits provide information regarding the residency of their members. *Id.* at ¶ 10. Based on this information, the City has ensured that organizations applying for field use permits have at least a majority of San Carlos residents. *Id.* The City states that it has consistently applied the majority residency requirement to applicant organizations as a whole, and not to individual teams within an organization. *Id.* at ¶ 6. This is because, the City contends, it would be burdensome

United States District Court
For the Northern District of California

3

to issue permits individually to each of the hundreds of teams playing on fields in San Carlos and to keep track of the residency levels of each of these teams separately. *Id.* at ¶ 7. In addition to SAYSO, Several other sports organizations have had their requests for field use permits denied because they did not have a majority of San Carlos residents in their organizations. *Id.* at ¶ 11. These organizations include the Palo Alto Tomahawks Lacrosse Club, Starmakers Baseball, Ultimate Frisbee League, Whippet Fanciers' Association, Woodside High School Baseball, and Youth and Adult Rugby. *Id.*

In October of 2001, the City received the final version of an agronomic report on the condition of the City's playing fields. *Id.* at ¶ 20. The report found that San Carlos's playing fields were being used too intensively to sustain healthy turf and to maintain safe playing surfaces. *Id.* It found that in 2000 the fields were used at 2.1 times the maximum recommended rate and estimated that in 2001, with the projected increase of soccer and baseball usage, the field usage would be 2.5 times the maximum recommended rate. *Id.* The Report suggested reducing the number of games by 10% to 20% and practices by 25%. *Id.*

In response to the agronomic report, in January of 2002 the City required the sports organizations using San Carlos playing fields to reduce their practice time by 25%. *Id.* at ¶ 21. In the spring of 2002, the City also implemented a "freeze" on new field use permit allocations in order to help control the overuse of the City's playing fields. *Id.* at ¶ 22. New programs were not allowed to use the fields, and existing programs were not allowed to expand their use. *Id.* Under the freeze, many sports programs have been denied permits either to start a program or to expand an existing program. *Id.* at ¶ 24. These programs included Adult Soccer, Adult Baseball, Adult Women's Field Hockey, Adult Cricket, Grass Volleyball tournaments, and youth sports camps. *Id.* The freeze is still in effect. *Id.* at ¶ 28.

In the fall of 2001, Michael Lindeburg, the President of SAYSO, asked Jennifer Moore, an employee of the Parks and Recreation Department of the City of San Carlos, for a playing field for his team to practice. *Id.* at ¶ 29. Moore mistakenly believed that Lindeburg's team was part of San

United States District Court
For the Northern District of California

Carlos United, a San Carlos-based soccer club with a majority of San Carlos residents that receives field use permits.[3] *Id.* Moore issued Lindeburg a field use permit for one field once a week for practices because she believed that it was part of the field use time that had been allotted to San Carlos United. *Id.* SAYSO therefore used a City field for practices in the spring of 2002. *Id.*

In March of 2002, Moore was informed by a representative of San Carlos AYSO that, although SAYSO operated under the umbrella of CYSA, it was not part of San Carlos United. *Id.* at ¶ 31. When SAYSO again asked for field use permits, its request was denied. The City states that this was because the City now understood that SAYSO was a separate organization from San Carlos United and did not have a majority of San Carlos residents, *id.*, ¶ 32, and because it would have violated the freeze to issue field use permits to SAYSO because it was a new program. *Id.* On November 4, 2003, the City issued a formal denial of SAYSO's request for Field use permits. *Id.* at Exh. K. The City's reasons for denying SAYSO's request for Field use permits — the residency requirement and the freeze — were reiterated in e-mails, correspondence, and orally. *Id.* at Exh. L.

On November 24, 2003, Lindeburg appeared before the City Council to discuss the denial. Decl. of Michael Lindeburg at ¶14. On December 2, 2003, Parks and Recreation Director Barry Weiss wrote Lindeburg, responding to Lindeburg's comments at the City Council meeting. *Id.* at ¶ 15, Exh. F. In his written response to Lindeburg, Weiss stated :

> San Andreas Youth Soccer Organization (SAYSO) does not have a majority of San Carlos residents in its league as required by the City's Field Use Policy. You do state that two teams you request field space for would consist of primarily San Carlos residents. As required by the City's Field Use Policy, first priority shall be given to organizations with 90% or greater residency and not less than 80% residency per team. Second priority shall be given to all other leagues and organizations. Using this Field Use Policy criteria, SAYSO is in this second priority group.

*Id.*

---

[3]The parties dispute the facts relating to Moore's confusion about whether Lindeburg's teams were part of San Carlos United. Moore states that Lindeburg "mentioned that he was affiliated with CYSA," which Moore mistakenly believed meant that his team was part of San Carlos United. Lindeburg states that he told Moore that SAYSO was affiliated with the United States Club Soccer, not CYSA, as Moore claims. *See* Opp. at 3, fn. 5.

5

**United States District Court**
For the Northern District of California

2. **The Community Activity Sign Ordinance**

The City of San Carlos has a general prohibition on the placement of temporary A-frame signs in the public right-of-way. Decl. of Elizabeth Cullinan at ¶ 5. The purpose of this prohibition is to prevent a proliferation of signs that would impede pedestrian traffic on sidewalks or vehicle traffic in the streets, to prevent the visual blight that would be caused by sidewalks and streets being cluttered with signs, and to minimize safety hazards that can occur when these types of signs blow into the street or other areas. *Id.*

The City states that a need for a limited exception to the ban became apparent as temporary signs announcing community activities, such as social, cultural, and sporting events, were being placed around the City despite the ban. *Id.* at ¶ 5. The City therefore decided to permit the placement of temporary "Community Activity Signs" under specifically regulated circumstances. *Id.* A permit to place a sign must first be obtained from the City. *Id.* The Planning Director, Public Works Director and Police Department collectively selected seven locations in the City where these signs could be placed. *Id.* No more than three signs can be placed at each location at a time, no more than four signs per organization can be placed at one time, and the signs can only be placed for fourteen days. *Id.*

On November 16, 2005, SAYSO applied for an A-Frame Sign permit by submitting the City's "Application for A-Frame Sign" form at the San Carlos City Hall in connection with its advertising of soccer tryouts to be held in the city of Belmont. Decl. of Serena Ponzo at ¶3, Exh. A. At the time of SAYSO's application, the City sign ordinance had no explicit requirement that the applicant be a "City affiliated" organization. *Id*. at ¶6. However the City did have policy guidelines, provided to all applicants, stating that "Applications from Non-City affiliated organizations are not accepted at this time." *Id*. at ¶ 4, Exh. B. However, these guidelines carried no definition of what "Non-City Affiliated" meant. *Id.*

The City's receptionist, who received SAYSO's application, was unsure whether SAYSO was a "City affiliated" organization and asked the Planning Department for assistance. *Id.* at ¶ 5. City staff looked to the Field Use Policy for guidance on the definition of "City affiliated" and determined that

6

United States District Court
For the Northern District of California

SAYSO was not "City affiliated " because it did not have 50% or more of its members as residents of San Carlos. *Id.* at ¶ 6. Lindeburg was notified of this decision and was specifically informed that under Chapter 18.132 of the San Carlos Municipal Code, SAYSO could appeal this decision to the Planning Commission, from which an appeal could also be taken to the City Council. *Id.* at ¶¶ 7, 8, Exhs. D and E. SAYSO did not file an appeal. *Id.* at ¶ 9. SAYSO states that it did not file an appeal because the City specifically resorted to using the Field Use Policy to justify its denial of SAYSO's A-Frame Sign application after having used the Policy to repeatedly justify its denial to SAYSO of field use permits. Lindeburg Decl. at ¶ 23. Because SAYSO had already unsuccessfully appealed the application of Policy to its request for field use permits, "SAYSO concluded that appealing the denial of the A-Frame sign application, at a cost of over $1,200[4], would have been futile." *Id.*

In February of 2006, the City Attorney recommended that the Municipal Code be amended to define the term "Community Activity Sign." Cullinan Decl. at ¶ 9. The City Attorney's memorandum to the Planning Commission and City Council explained that, because the Municipal Code lacked a clear definition of the term "Community Activity," City staff had had difficulty in applying the sign ordinance. *Id.* at Exh. A. During her deposition, Elizabeth Cullinan, Planning Director for the City, stated that the recommended change was prompted, at least in part, by SAYSO's application. Decl. of Daniel C. Zamora Exh. C at 34:20-36:6.

On April 24, 2006, the City Council held a public hearing on proposed Ordinance 1371, which would amend section 18.150.060 of the San Carlos Municipal Code to include the following definition of "community activity sign":

"Community activity sign" means a sign, poster, banner or A-frame advertising an event or activity of civic interest to occur in the City of San Carlos, sponsored by the City of San Carlos or by a group or entity whose membership or participants are primarily (fifty percent or more) residents of the City of San Carlos.

---

[4] The estimated cost for the appeal included a $805 appeal fee and a $400 deposit, both to be paid to the City. Lindeburg Decl. at ¶ 23.

7

Cullinan Decl. at ¶ 10. Following the public hearing on April 24, 2006, the City Council voted unanimously to introduce Ordinance 1371, and Ordinance 1371 was subsequently adopted by the San Carlos City Council on May 22, 2006. *Id.*, ¶¶ 11, 12.

**3.      Plaintiffs' Claims**

Plaintiffs filed their Complaint on May 11, 2006. They assert five claims for relief:

1.      That the City's denial of Field use permits to SAYSO violated the equal protection rights of SAYSO and the individual plaintiffs because similarly situated organizations and individuals have obtained access to the City's playing fields. Compl. at 12:17-14:11.

2.      That the 50% residency requirement for organizations applying for temporary Community Activity Sign permits violates SAYSO's free speech rights. *Id.* at 14:12-15:15.

3.      That the City's disparate application of its field use policy to SAYSO and the individual plaintiffs violates 42 U.S.C. section 1983. *Id.* at 15:17-16:17.

4.      That the City's denial of Field use permits to SAYSO violates the City's Field Use policy. *Id.* at 16:18-17:15.

5.      That the plaintiffs are entitled to a writ of mandate compelling the City to issue Field use permits to SAYSO. *Id.* at 17:16-18:12.

The Complaint only seeks equitable relief and does not seek damages. Specifically, the plaintiffs seek:

1.      A declaration that the City's Field Use Policy as applied to the Plaintiffs violates their equal protection rights.

2.      A declaration that the City's temporary Community Activity Sign Ordinance on its face and as applied to SAYSO violates SAYSO's free speech rights.

3.      A declaration that the Plaintiffs' civil rights have been violated under 42 U.S.C. § 1983.

4.      An injunction preventing the City from violating the Plaintiffs' equal protection rights.

5.      An injunction preventing the City from violating SAYSO's free speech rights.

6.      An injunction preventing the City from violating the Plaintiffs' civil rights under 42

1  U.S.C. § 1983.

2      7.      A writ of mandate directing the City to issue SAYSO field use permits. *Id.* at

3  18:15-19:15.

### LEGAL STANDARD

5      Summary judgment is appropriate if no genuine issue of material fact exists and the moving

6  party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477

7  U.S. 317, 322-23 (1986). The moving party bears the initial burden of demonstrating the absence of any

8  genuine issue of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.

9  2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the

10  non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip*

11  *Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect

12  the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

13      Once the moving party meets its initial burden, the burden shifts to the non-moving party to set

14  forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Horphag*, 475 F.3d

15  at 1035. In responding to a properly supported summary judgment motion, the non-movant cannot

16  merely rely on the pleadings, but must present specific and supported material facts, of significant

17  probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

18  *Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002);

19  *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine

20  issue of material fact exists, the court views the evidence and draws inferences in the light most

21  favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*,

22  365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir.

23  2004).

24

25

26

27

28

United States District Court
For the Northern District of California

## ANALYSIS

**1.      Equal Protection**

      **A.      The Residency Requirement**

Plaintiffs concede that the Policy's limitation requiring organizations to have 50% or more resident members to qualify for field use permits is facially valid. Opp. at 15:18-21. Because the City's residency restriction relates to recreational activities and does not implicate a suspect classification, the City need only have a rational basis for the restriction. *See Hawaii Boating Association v. Water Transportation Facilities Division, Dept. of Transportation, State of Hawaii*, 651 F.2d 661, 664 (9th Cir. 1981); *see also Patel v. Penman*, 103 F.3d 868, 875 (9th Cir. 1996) ("When a government's action does not involve a suspect classification or implicate a fundamental right, it will survive constitutional scrutiny for an equal protection violation as long as it bears a rational relation to a legitimate state interest."). Plaintiffs also concede that significantly less than 50% of SAYSO's members are San Carlos residents. Compl. at 6:4-8.

Plaintiffs argue that the Policy is unconstitutional as applied because other, supposedly more favored organizations with less than 50% resident members have been granted field use permits while SAYSO has been denied such permits. A successful equal protection claim may be brought by a "class of one" when the plaintiff alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *SeaRiver Maritime Financial Holdings, Inc. v. Mineta,* 309 F.3d 662, 679 (9th. Cir. 2002), (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Defendants argue that plaintiffs' equal protection claims fail because SAYSO cannot show that it has been treated differently from other similarly situated applicants for field use permits, since numerous organizations that, like SAYSO, have less than a majority of their members as resident of San Carlos have also been denied permits.

Plaintiffs' equal protection claim rests on two basic factual premises. First, plaintiffs argue that the fact that SAYSO was initially issued field permits, but was subsequently denied their renewal after members of competing soccer leagues pointed out that allowing SAYSO to use the field was

United States District Court
For the Northern District of California

1    inconsistent with the Policy, demonstrates that SAYSO was singled out for disparate treatment. Second,

2    plaintiffs argue that the fact that San Carlos AYSO has been issued field use permits despite the fact that

3    only a fraction of the statewide AYSO organization's members are residents of San Carlos demonstrates

4    that the City's grounds for refusing the permits to SAYSO are pretextual.

5        Plaintiffs' first argument is unavailing. Plaintiffs argue that the fact that Moore is listed on San

6    Carlos United's website as an "assistant team manager," Lindeburg Decl., ¶ 18, Exh. A, in combination

7    with the fact that Moore refused to issue permits to SAYSO after members of San Carlos United and

8    San Carlos AYSO pointed out the problem with SAYSO's use of the fields, somehow demonstrates that

9    Moore's refusal to issue the permits was in bad faith. However, as Moore states in her sworn

10   declaration, she initially issued the permits because she mistakenly believed that Lindeburg's teams

11   were part of San Carlos United, an organization to which field use permits had already been allotted.

12   Lindeburg states that he told Moore that SAYSO was affiliated with "United States Club Soccer," not

13   CYSA, as Moore claims.  *See* Opp. at 3, fn. 5. However, Lindeburg presents no evidence that the

14   supposed fact that he identified SAYSO as being affiliated with "United States Club Soccer"rather than

15   CYSA in any way negates Moore's statement that she believed Lindeburg's teams were associated with

16   San Carlos United. Indeed, despite the fact that plaintiffs deposed Moore and included portions of her

17   deposition for the Court's consideration, plaintiffs fail to identify any statements by Moore suggesting

18   that Moore's alleged confusion demonstrates bias against SAYSO. This minor factual dispute fails to

19   raise a triable issue of fact as to whether the City's purported justification for denying SAYSO field use

20   permits is pretextual.

21       SAYSO also argues that the fact that other organizations with less than 50% membership have

22   been granted field use permits demonstrates that the Policy is arbitrarily or discriminatorily applied to

23   SAYSO. SAYSO's primary argument in this respect is that San Carlos AYSO does not qualify for field

24   use permits because it is a branch of the statewide AYSO organization, which, by virtue of its nature

25   as a statewide organization, has only a fraction of members who are residents of San Carlos. Plaintiffs

26   argue that since SAYSO was denied permits for two of its individual teams which SAYSO claimed had

27

28                                                       11

1   more than 50% San Carlos residents on the grounds that the SAYSO organization as a whole does not

2   have 50% or more resident members, it is inconsistent for the City to issue permits to San Carlos AYSO

3   when AYSO as a whole has only a fraction of San Carlos residents as members.

4   An essential element of plaintiffs' argument is the claim that the Policy allows the City to look

5   to the residency of individual *teams*, rather than organizations, in issuing field permits. However, the

6   Policy itself does not support plaintiff's interpretation. The Policy states that "only organizations *and*

7   teams with a majority of San Carlos residents will be considered for field permits" (emphasis added).

8   The conjunctive nature of this requirement is made clear by the Policy's requirement that first priority

9   be given to organizations with 90% or greater residency *and* not less than 80% residency *per team*. In

10  other words, both the organization and the individual teams within the organizations must have a

11  majority of residents to quality for permits. SAYSO erroneously interprets this conjunctive requirement

12  disjunctively, interpreting it to mean that either organizations *or* teams must have a majority of San

13  Carlos residents.

14  Despite the plain language of the Policy, plaintiffs point to various inconsistencies in the City's

15  explanation of why it denied the permits to SAYSO as indicating that the City understood that the

16  residency of teams, rather than the organization as a whole, may be considered in granting permits.

17  Plaintiffs' chief piece of evidence for this position is Parks and Recreation Director Barry Weiss's

18  written response to Lindeburg's comments at the City Council meeting, which states:

19  > San Andreas Youth Soccer Organization (SAYSO) does not have a majority of San
20  > Carlos residents in its league as required by the City's Field Use Policy. You do state
> that two teams you request field space for would consist of primarily San Carlos
21  > residents. As required by the City's Field Use Policy, first priority shall be given to
> organizations with 90% or greater residency and not less than 80% residency per team.
22  > **Second priority shall be given to all other leagues and organizations. Using this
> Field Use Policy criteria, SAYSO is in this second priority group**.

23  Lindeburg Decl at Exh. F (emphasis added). However, the fact that Weiss stated that SAYSO was in

24  the "second priority group," i.e. was an organization with less than 90% residency overall or not less

25  than 80% residency per team, does not negate the requirement that an organization must still have 50%

26  or more residency to be issued permits *at all*. While perhaps infelicitously phrased, Weiss's letter fails

27

28                                                            12

1  to raise a triable issue of fact as to whether the City discriminatorily applied the residency requirement

2  to the organization as a whole rather than individual teams in SAYSO's case.

3       Somewhat desperately, plaintiffs point to an exchange during Moore's deposition between

4  Moore and plaintiffs' counsel in the hopes of raising a triable issue of fact with respect to this issue.

5  When Moore was asked if SAYSO were to adopt an AYSO-like "San Carlos" name such as "San Carlos

6  SAYSO" for its teams comprised of only San Carlos residents, she stated that she would have continued

7  to refer to the residency of the entire organization, and not just the "San Carlos SAYSO" teams. Zamora

8  Decl., Exh. A at 126:22-127:2. Plaintiffs argue that this shows that Moore applied different, more

9  restrictive criteria to SAYSO than she did to San Carlos AYSO. However, this statement merely shows

10 that Moore would not issue a permit to an organization that misrepresented the nature of its members'

11 residency by changing its name. Immediately following the portion of Moore 's deposition that plaintiffs

12 cite, Moore makes clear that she considered San Carlos AYSO a *distinct entity* for the purposes of

13 determining residency. *Id.* at 127:3-19.

14      As Defendants point out, San Carlos AYSO is in fact a distinct administrative body, with its own

15 administrative guidelines and leadership. *See* Moore Supp. Decl. at Exh. A.  The San Carlos AYSO

16 Regional Guidelines explain that it is the authorized youth soccer organization chartered under the

17 national by-laws of the American Youth Soccer Organization operating within the city boundaries of

18 the City of San Carlos. *Id.* In 2005, San Carlos AYSO had164 teams. *Id.* It covers a geographic area that

19 is coterminous with the boundaries of the City of San Carlos, and with a few limited exceptions, only

20 residents of San Carlos may join San Carlos AYSO. *Id.* The business affairs of San Carlos AYSO are

21 handled by its own board. *Id.* The board sets the fees for the players and provides the uniforms, fields,

22 and goals. *Id.* San Carlos AYSO has its own bank account, prepares it own budget, and manages its own

23 finances. *Id.* 97% of the players in San Carlos AYSO are residents of San Carlos. Moore Decl., ¶ 12.

24 Simply put, San Carlos is an *organization* with nearly all of its members as residents of San Carlos,

25 whereas SAYSO is an organization with approximately 14% San Carlos resident members. Plaintiffs

26 cannot legitimately argue that the hypothetical posed to Moore, in which SAYSO merely called one of

27

28

its teams "San Carlos SAYSO" draws a correct analogy to San Carlos AYSO. Plaintiffs' argument, based on it is on a hypothetical question posed to a City administrator during a deposition, fails to raise a triable issue of fact as to whether the City's stated reasons for denying SAYSO field use permits are pretextual.

Finally, plaintiffs argue that the City has made "ad hoc" exceptions to the residency rule and therefore its refusal to make such an exception in SAYSO's case is discriminatory. Specifically, plaintiffs point out that the City issues special permits for tournaments, which include out-of-town teams, and also allows a city-run non-profit organization, "Kidz Love Soccer," to use the field without permits. Opp. at 8:22-9:15. It is difficult to see why plaintiffs believe SAYSO is similarly situated to the applicants who received permits under these exceptions, and plaintiffs present no affirmative argument that it is. Accordingly, this argument fails to raise a triable issue of fact as to whether SAYSO has been treated differently from other similarly situated applicants.

> **B.**     **The Permit Freeze**

Defendants argue that, aside from the residency requirement, the freeze on issuing permits to new organizations constitutes a separate, independent basis for denying permits to SAYSO. SAYSO does not deny that the freeze went into effect before SAYSO requested permits. Rather, it relies on the purported inconsistencies noted above to suggest that the application of the freeze to SAYSO is somehow pretextual. *See, e.g,* Opp. at 21:13-17. Plaintiffs present no affirmative evidence with respect to this argument and therefore plaintiffs fail raise a triable issue of fact with respect to this claim.

**2.     Free Speech**

Plaintiffs argue that the City's A-Frame sign ordinance requiring that organizations have greater than 50% San Carlos resident membership in order to post signs, both as enacted and as applied to SAYSO, operates as an unconstitutional prior restraint on SAYSO's constitutionally protected speech under the First Amendment of the United States Constitution and Article 1, § 2 of the California Constitution. Defendants argue that plaintiffs' free speech claims fail on two grounds. First, defendants argue that plaintiffs failed to exhaust their administrative remedies and therefore lack standing to pursue

their claims. Second, defendants argue that the City's decision to allow city-affiliated organization to post A-frame advertisements on city sidewalks created only a limited public forum, and therefore the City's restrictions on the content of the advertisements (i.e., that they be city-affiliated) is permissible.

Defendants' first argument is persuasive. SAYSO had an explicit administrative remedy available to challenge the City's denial of SAYSO's application for a temporary Community Activity Sign permit, but chose not to pursue it. Under section 18.132.010 of the San Carlos Municipal Code, SAYSO had the right to appeal the denial to the Planning Commission. Ponzo Decl. at Exh. E. Under section 18.132.030, SAYSO would have received a hearing before the commission and would have had the right to be heard. *Id.* Under section 18.132.030 of the San Carlos Municipal Code, the decision of the Planning Commission could have been appealed to the City Council, where again a hearing would be held. *Id.* Although Lindeburg was sent an e-mail advising SAYSO of these remedies, SAYSO did not file an appeal. Ponzo Decl.at Exh. D,

Under the doctrine of exhaustion of administrative remedies, a party may not seek judicial review of an adverse administrative decision until the party first pursues all possible relief within the agency. *Young v. Reno*, 114 F.3d 879, 881 (9th Cir. 1997). SAYSO argues that it was excused from the exhaustion doctrine by the "futility" exception to the doctrine, claiming that "[o]nce the City decided to use its field-use policy to deny SAYSO's application, SAYSO reasonably concluded that an appeal (like its prior appeal under the Policy itself) would have been a useless and a futile act." Opp. at 24:9-13 Plaintiffs correctly cite *Ogo v. City of Torrance*, 37 Cal.App.3d 830, 834 (1974) for the proposition that an exception to the exhaustion doctrine exists where "the aggrieved party can *positively* state what the administrative agency's decision in his particular case would be" (emphasis added). However, *Ogo* is of no use to plaintiffs. In *Ogo*, the court found that, based on "overwhelming evidence," the plaintiffs could "positively state" that the city council would not have granted the plaintiffs' request for a zoning variance. *Id.* Here, in contrast, plaintiffs have presented *no* evidence, other than their own estimation based on their experience appealing the denial of the field use permits, that an appeal would be futile. However, plaintiffs are not in a position to opine as to the outcome of an appeal of the signage ordinance

1   based on First Amendment grounds when SAYSO's appeal of the Policy with respect to field use

2   permits did not involve such issues. Moreover, the assertions that plaintiffs considered the success of

3   an appeal unlikely, and that the appeal would cost plaintiffs $1200, do not constitute 'positive

4   statements' that an appeal would be futile. Because SAYSO decided not to appeal the denial of its

5   permit, and therefore did not exhaust its administrative remedies, SAYSO's challenge to this denial is

6   premature. *Young*, 114 F.3d at 881. Because the Court finds that summary judgment may be granted on

7   procedural grounds, it does not reach the merits of plaintiffs' constitutional claim. *See Escambia County*

8   *v. McMillan*, 466 U.S. 48, 51(1984) (constitutional questions should be avoided if there are narrower

9   grounds for making a decision).

10   **3.       Plaintiffs' Claims Under the California Constitution**

11          In addition to their claims under the United States Constitution, plaintiffs allege violations of

12   the equal protection rights afforded by Article 1, § 7 of the California Constitution and violations of the

13   free speech protections afforded by Article 1, § 2 of the California Constitution. California Courts have

14   held that the Fourteenth Amendment's guarantee of equal protection and the California Constitution's

15   protection of the same right under Article 1, § 7 are substantially equivalent and are analyzed in a

16   similar fashion. *Landau v. Superior Court*, 81 Cal. App. 4th 191, 207 (1998); *see also In Re Evans*, 49

17   Cal. App. 4th 1263, 1270 (1996) ("The equal protection clauses are found in the Fourteenth Amendment

18   to the United States Constitution and section 7(a) of article I of the California Constitution. The scope

19   and effect of the two clauses [are] the same."). Plaintiffs have provided no authority suggesting the

20   California Constitution's equal protection clause is any more expansive than the protections afforded

21   by the United States Constitution. Accordingly, plaintiffs' equal protection claim under Article 1, § 7

22   of the California Constitution fails for the same reasons that plaintiffs' Fourteenth Amendment claim

23   fails.

24          Like the federal courts, California Courts adhere to both the doctrine of the exhaustion of

25   administrative remedies, *see, e.g., Mountain View Chamber of Commerce v. City of Mountain View*,

26   77 Cal. App. 3d  82, 93, 143 (1978)(plaintiffs attacking city's signage regulations are required to first

27

28                                                        16

exhaust the administrative remedies set out in the ordinance before seeking judicial relief), as well as the prudential maxim of avoiding constitutional issues where other grounds for a decision are available. *See, i.e., Santa Clara County Local Transportation Authority v. Guardino*, 11 Cal.4th 220, 230 (1995)(courts should not reach constitutional questions unless absolutely required to do so to dispose of the matter). Accordingly, plaintiffs' equal protection claim under Article 1, § 2 of the California Constitution fails for the same reasons that plaintiffs' First Amendment claim fails.

**4.      42 U.S.C. § 1983, Violation of the City's Field Use Policy, and Writ of Mandamus**

Plaintiffs' remaining claims for violations of 42 U.S.C. § 1983, violations of the City's Field Use Policy, and for a writ of mandamus directing the City to issue SAYSO Field use permits stand or fall with plaintiffs' equal protection and free speech claims. The Plaintiffs' third claim for relief asserts that the City's "disparate enforcement of the Field Use Policy in allowing other similarly situated organizations and persons access to San Carlos' soccer fields while simultaneously denying access to Plaintiffs" deprived plaintiffs of their equal protection rights under 42 U.S.C. section 1983. Compl. at 16:5. However, as the Court has already determined that plaintiffs' equal protection rights have not been violated, plaintiffs' section 1983 claim fails. Similarly, the court has determined that defendants have not violated the City's Field Use Policy, and therefore plaintiffs' claims for declaratory relief and issuance of a writ of mandamus directing the city to issue field use permits to SAYSO also fail. Defendants are entitled to summary judgment on these claims.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT defendants' Motion for Summary Judgment [Docket No. 24] is GRANTED.

IT IS SO ORDERED.

Dated: 5-9-07

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
United States District Judge

17